UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES BENJAMIN FOWLER,<br><br>                                        Petitioner,<br><br>          v.<br><br>MIKE EVANS, Warden, et al.,<br><br>                                        Respondent. | Civil No.    06cv2551-JM (POR)<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.     INTRODUCTION

On November 15, 2006, Petitioner Charles Benjamin Fowler ("Petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254.  This Court has reviewed the Petition, Respondent's Answer, Petitioner's Traverse, and all supporting documents.  After a thorough review, this Court finds that Petitioner is not entitled to the relief requested and recommends the Petition be **DENIED**.

## II.    PROCEDURAL BACKGROUND

On December 1, 2003, after a jury trial, Petitioner was convicted of ten counts of robbery and one count of attempted robbery pursuant to California Penal Code § 211.  (Lodgment 1 at 479-83.)  The trial court separately found Petitioner had suffered a serious felony prior within the meaning of California Penal Code sections 667(a)(1), 668, and 1192.7 (c) and three strike priors within the meaning of California Penal Code sections 667(b) - (i), 1170.12, and 668.  (Lodgment 1 at 501; Lodgment 8 at 5.)  Petitioner was sentenced to 25 years to life for the strike-enhanced robberies and

attempted robbery, plus five years for the serious felony prior. (Lodgment 8 at 210-12.) Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment 4, 6, 7.) The Court of Appeal affirmed the judgment on January 25, 2006. (Lodgment 2.) Petitioner then filed a petition for review in the California Supreme Court. (Lodgment 5.) The Court denied the petition without citation to authority on April 12, 2006. (Lodgment 3.) On November 15, 2006, Petitioner filed a petition for writ of habeas corpus. On February 1, 2007, Respondent filed an Answer. Petitioner filed a Traverse on March 5, 2007.

## III.   FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion in *People v. Fowler*, No. SCD 166210, slip op. (Cal. Ct. App. Jan. 25, 2006). (Lodgment 2.) The Court presumes these factual determinations are correct pursuant to 28 U.S.C.A. § 2254(e)(1).

Counts 1 and 2

On October 18, 2001, Fowler, wearing a dreadlocks wig, entered the Bank of America on Scranton Road and gave bank teller Noosha Sharif a note stating, "This is a robbery. Keep quiet and give me 20, 50 and hundred new dollar bills." Sharif tried to keep the note, but Fowler leaned forward, grabbed her shoulder, and pulled her towards him to try to get the note. Sharif told Fowler she did not have her keys to her drawer. Fowler responded. "[W]hat do you mean you don't have your keys? Do you understand this is a robbery?" Fowler started yelling, asking, "Where [are] the keys?" Fowler went to another teller, Manuel Jusay, and in a mumbling voice asked for the "hundreds, 50s and 20s." Jusay opened his drawer and gave Fowler $2,000 to $4,000. Jusay pressed his alarm button when Fowler left his teller window.

After robbing Jusay, Fowler returned to Sharif, asking her and other employees for the keys and demanding money. Sharif and the employees told him they did not have the keys. Sharif offered Fowler $100 in quarters, which Fowler did not take.

Sharif and Jusay testified they felt afraid and intimidated during the incident.

Count 3

On October 29, 2001, Fowler, wearing a dreadlocks wig, entered the Bank of America on Poway Road, handed a note to teller Donald Kirchmeier that Kirchmeier could not read, and asked for his "50s, hundreds and 20s." Kirchmeier gave Fowler the money in his top drawer as he was "trained to do" and then pressed his alarm. Kirchmeier testified he felt "a little nervous" but not intimidated; he "was just trying to remember (sic) everything that [he] was taught" and "felt like [he] needed to do [his] job and get [Fowler] out as quickly as possible." Kirchmeier explained that he was not forced to give the money, but that the bank had trained the employees to respond to a robbery by "giv[ing] the money as quickly as possible to insure the safety of co-workers and customers in the bank." Kirchmeier ascertained that he needed to comply with Fowler's demands because of "the note and [Fowler] asking it from [him] and the situation . . . ."

Count 4

On October 30, 2001, Fowler was standing in line at the Wells Fargo Bank on Fletcher Parkway. He was wearing a dreadlocks wig, sunglasses, and acting nervous. At teller Ruth Cherry's window, Fowler displayed a "wad of cash" and inquired about opening a new account. He tried to give her a note, and then told her: "This is a robbery. [¶] Give me all your large bills [¶] . . . [¶] [in] hundreds, 50s and 20s." He told her not to press her alarm. Cherry gave Fowler some money, then gave him more money when he asked for more (totaling about $4,000), and pressed her alarm. Fowler told Cherry to walk with him to the back of the bank. Cherry walked halfway with him and then turned around and called out to her manager. Fowler then left the bank.

Cherry testified she felt nervous when she realized what was happening and felt frightened and intimidated.

Count 5

On December 21, 2001, Fowler, wearing a dreadlocks wig, entered the Bank of America on Grossmont Center Drive. He presented teller Julie Carrillo with a note on the back of a deposit slip that stated, "This is a robbery, don't press any buttons." He told her to give him all her 20's and 50's; she complied. He then asked for her large bills; she gave him some but not all of them. Appearing agitated, Fowler demanded the rest of the bills. Carrillo told him she did not have any more. Fowler told her to thank him and to tell him to have a nice day, and to say this loudly so that people could hear her. Carrillo complied.

Count 6

On December 17, 2001[1], Fowler entered the Bank of America on Clairemont Mesa Boulevard wearing a wig and sunglasses. Fowler told teller Sean Boang to relax, to give him his "hundreds, 50s, and 20s" and not to press any buttons. Boang lifted his drawer, took out 20's and 50's, and gave Fowler about $3,000. At one point, Boang started to reach to push his alarm under the counter, but stopped when Fowler gave him a threatening look. Boang felt that Fowler was being forceful with him and that he needed to give Fowler the money and listen to his directions. Boang did not push his alarm until Fowler was leaving the bank.

Count 7

During the afternoon of December 31, 2001, Fowler, wearing a wig and large glasses, approached teller Alison McCammack at the Wells Fargo Bank on Bonita Road. He had a "wad of money" and a deposit slip in his hand, and asked how to open a savings account. He then said in a low voice, "Give me all your 20s, 50s and hundreds and don't try anything funny." McCammack was shocked because she thought he was going to open a savings account, and asked him to repeat what he said. Fowler repeated his demand. When he told her not to try "anything funny," she was concerned for her safety and gave him all the money from her cash drawers. The money included a dye pack, which exploded when Fowler left the bank.

Count 8

In the evening of December 31, 2001, Fowler, wearing an "Afro wig" and glasses, entered the Bank of America on Balboa Avenue. Fowler approached teller Karen Lemus. Employee Maria Higuera thought Fowler looked suspicious, so she stood next to Lemus and asked her if she needed any help. Fowler made Lemus lean forward, and whispered in her ear that he

---

[1] This incident may have occurred on December 27.

wanted "hundreds, 50s and 20s." Lemus gave him "twenties, tens, and fives." Fowler asked for more money, but Lemus told him she did not have any more. Observing what was transpiring, Higuera pushed a hand-held alarm she had on her person. Teller Gabriel Arias noticed that Lemus looked "a little bit frantic" and he ascertained that she was being robbed.

Lemus testified she was frightened during the incident, and when she later saw Fowler's picture in a photographic line-up her "head began to hurt."

Count 9

On February 7, 2002, Fowler, wearing a large black "Afro" wig and aluminum foil on his teeth, entered the Bank of America on Bonita Road. Fowler handed teller Amy Bush a check that said: "'This is a robbery, give me all your money' [¶] . . .[¶] . . . hundreds, 50s and 20s." Bush pulled her security alarm, opened her drawer, slowly took out her large bills, and slowly handed them to Fowler. Fowler asked her if she had any more. She told him no. He thanked her and told her to have a good day. Bush testified she felt afraid.

Count 10

On February 12, 2002, Kirchmeier was again robbed by Fowler at the Bank of America on Poway Road. When Fowler, wearing a wig, entered the bank, Kirchmeier recognized him. Both Kirchmeier and his bank manager triggered the alarm. Kirchmeier, who was working at a table, went and opened his teller window so Fowler would come to his window. In the presence of Kirchmeier's bank manager, Fowler first tried to cash a check with someone else's name on it, but Kirchmeier told him he needed identification. When the bank manager walked away, Fowler, in a soft voice that was difficult to understand, asked for "50s, hundreds and 20s." Kirchmeier "did what [he] was trained to do" and gave Fowler the money. During this second robbery, Kirchmeier felt "a little angry because [he] recognize[d] [Fowler] and . . . it happened again." Kirchmeier reiterated that his bank's policy was to "comply with the person in front of you to make sure that they don't get hostile or endanger other people."

Count 12

On February 27, 2002, Fowler, wearing the same wig, "fake Halloween type teeth," and glasses, again robbed the Bank of America on Balboa Avenue. Fowler approached teller Gabriel Arias, mumbled something, and presented him with a note that said something like: "Give me all your 20s, tens, fives, ones. [¶] . . . [¶] Don't give me any fake bills and don't trigger any alarms." Feeling fearful, Arias gave Fowler what he had in his drawer. Employee Higuera, who recognized Fowler when he walked in, pushed the alarm as he was robbing Arias. As Fowler was fleeing the scene, the bank employees wrote down the license plate number of the vehicle that he was driving.

**IV.    STANDARD OF REVIEW**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). As amended, the AEDPA now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

28 U.S.C.A. § 2254(d) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. Williams v. Taylor, 520 U.S. 362, 406 (2000). Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 71 (2003). However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established Federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established Federal law. See Lockyer, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. at 405-06. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to

extend that principle to a new context where it should apply." Id. at 407. Under Williams, an application of federal law is unreasonable only if it is "objectively unreasonable." Id. at 409.

Further, a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. If a state court fails to provide a reasoning for its decision, habeas review is not *de novo*, but requires an independent review of the record to assess whether the state court erred in its application of controlling federal law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

## V. DISCUSSION

### A. Jury Instruction Error

Petitioner argues that the trial court failed to properly instruct the jury on the elements of robbery in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. He alleges that the trial court failed to instruct the jury that it must assess the victims' fear using both an objective and subjective standard. Specifically, he contends that the trial court should have instructed the jury that the victims were actually afraid and that their fear was reasonable.

In Cupp v. Naughten, 414 U.S. 141 (1973), the United States Supreme Court presented the standard for jury instruction error in habeas cases. The only question for a federal habeas court is whether, "under the circumstances as a whole and given the evidence in the case, the failure to give the requested instruction rendered the trial so fundamentally unfair as to violate federal due process." Duckett v. Godinez, 67 F.3d 734, 746 (1995) (citing Cupp, 414 U.S. at 147). "Not every

ambiguity, inconsistency or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). Moreover, a single jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp, 414 U.S. at 146-47. "An omission . . . is less likely to be prejudicial than a misstatement of the law" and the petitioner bears an "especially heavy" burden. Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

If there is a jury instruction error as to an element of the offense, it is subject to a harmless error analysis. Neder v. United States, 527 U.S. 1, 9-11 (1999); Evanchyk v. Stewart, 340 F.3d 933, 940 (2003). Under Brecht, "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623, 637(1993). Neither party has the burden of proving or disproving that the error had the requisite influence on the jury's verdict. See O'Neal v. McAninch, 513 U.S. 432, 436 (1995); Thompson v. Borg, 74 F.3d 1571, 1575 (1996). Instead, the reviewing judge examines the record and asks, "Do I, the judge, think that the error substantially influenced the jury's decision?" O'Neal, 513 U.S. at 436; Thompson, 74 F.3d at 1575. If the judge has "grave doubt" about whether the error had a substantial and injurious effect on the verdict, the error is not harmless. O'Neal, 513 U.S. at 436; Thompson, 74 F.3d at 1575.

In the post-AEDPA period, if a state court has conducted a harmless error analysis with respect to a constitutional error, in order to grant relief the Court must determine "(1) that the state court's decision was 'contrary to' or an 'unreasonable application' of Supreme Court harmless error precedent, and (2) that the petitioner suffered prejudice under *Brecht* from the constitutional error." Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir. 2005). If the state court's harmless error ruling is not contrary to or an unreasonable application of Supreme court precedent, courts must defer to the state court's harmless error ruling. Id. at 1061.

Petitioner argues the trial court erred when it did not instruct the jury that "it must find both that the victims were actually afraid and that their fear was reasonable." (Petition at 12.) In the absence of such an instruction, Petitioner asserts the jury was led to believe that any fear, even if the fear was the product of phobias and social anxiety disorders, would fulfill the fear element of

robbery. (Id. at 14.)

Because the California Supreme Court denied Petitioner's petition without citation, this Court will "look through" the summary denial to the last reasoned state court decision on the issue. Nunnemaker, 501 U.S. at 801. The last reasoned decision on this issue was in the state appellate court. (Lodgment 2.)

The court of appeal concluded that the trial court had no sua sponte duty to explain the robbery instructions by telling the jury that the victim's fear had to be actual and reasonable. (Id. at 10.) Alternatively, the state appellate court determined that even if "there was federal constitutional error arising from the failure to instruct the jury on the actual and reasonable fear concept , . . . any error was harmless beyond a reasonable doubt." (Id. at 10-11.)

The trial court instructed the jury on the robbery charge as follows: "every person who takes personal property in the possession of another against the will and from the person or immediate presence of that person, when the taking is accomplished by means of force or fear, and with the specific intent permanently to deprive the person of the property is guilty of the crime of robbery as we define that crime." (Lodgment 1 at 390-91.) As to the fear element, the trial court instructed the jury the following:

> Taking must have been accomplished by either force or fear. The element of fear as used in that element of the crime may be either fear of an unlawful injury to the person or the property of the person robbed or fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery.

(Id. at 392.) The trial court instructed the jury on all the elements of robbery. See Middleton, 541 U.S. at 437 (stating that in order to avoid a due process violation, jury instructions must state every element of the offense). The issue is whether the trial court had a sua sponte duty to further explain the definition of fear to the jury.

At trial, Petitioner did not request that the judge define fear to the jury. The defense theory at trial was that the victims identified the wrong defendant. His theory was not that the victims were not fearful at the time of robbery. The definition of "fear" was not material to the jury's resolution of the identification issue. (Lodgment 1 at 426-35.) Moreover, the court of appeal stated that under California law, "fear" is a term "commonly understood and presumed to be within the understanding

1  of the jurors." (Lodgment 2 at 9.)  In the Ninth Circuit, words of common knowledge that are not
2  defined especially where the instruction was not requested does not constitute plain error.  <u>United</u>
3  <u>States v. Garza-Juarez</u>, 992 F.3d 896, 910 (9th Cir. 1993).
4      The court of appeal found the record overwhelmingly supported a conclusion that
5  Petitioner's demands during the execution of the robbery engendered both actual and reasonable fear
6  in the employees.  (Lodgment 2 at 12-13.)   As to counts 1 and 2, teller Manuel Jusay testified that
7  he noted Petitioner when the teller next to him, Sharif, jumped back when Petitioner approached her
8  teller window.  (Lodgment 1 at 64.)  Jusay testified that during the robbery, he was fearful and
9  intimidated.  (<u>Id.</u> at 68.)  He also testified that the money was taken from him by force.  (<u>Id.</u> at 75.)
10 Teller Noosha Sharif testified that when she told Petitioner she did not have her teller key, he started
11 yelling "where the key" and stated that she was scared.  (<u>Id.</u> at 83-84.)  In count 6, teller Sean Boang
12 testified that he felt that he was forced to give the money to Petitioner.  (<u>Id.</u> at 90-91.)  When Boang
13 tried to push his alarm under the counter, Petitioner gave him a threatening look so he did not press
14 the alarm until Petitioner was on his way out.  (<u>Id.</u> at 94-95.)  In count 9, teller Amy Bush testified
15 that Petitioner wore a really large black Afro wig.  (<u>Id.</u> at 103.)  She stated that when she realized it
16 was a robbery, she was fearful.  (<u>Id.</u> at 105.)  As to count 7, teller Alison McCammack said that
17 Petitioner had a wig, large glasses and a hat to keep the wig on.  (<u>Id.</u> at 117.)  She testified that she
18 was fearful and concerned for her safety when he said not to try "anything funny."  (<u>Id.</u> at 118-19.)
19 As to counts 3 and 10, teller Donald Kirchmeier testified that Petitioner was wearing a dreadlock
20 wig.  (<u>Id.</u> at 132.) Although he was a little nervous, he testified that he followed bank policy during
21 the robbery to ensure the safety of co-workers and customers in the bank.  (<u>Id.</u> at 136.)  He testified
22 that he did not willingly give Petitioner the money but handed over the money because of the note
23 asking for the money.  (<u>Id.</u> at 136.)  During the second encounter, Kirchmeier recognized Petitioner
24 and triggered the alarm. (<u>Id.</u> at 139.)  Kirchmeier did what he was trained to do and gave him the
25 money.  (<u>Id.</u> at 141.)  On cross examination, he reiterated that his training was to comply with the
26 person to make sure that they don't get hostile and endanger other people.  (<u>Id.</u> at 146.)  In count 4,
27 teller Ruth Ann Cherry noticed Petitioner wore a dreadlock wig and sunglasses.  (<u>Id.</u> at 162.)  When
28 she realized what was happening, she got nervous and became intimated by him.  (<u>Id.</u> at 164.)  As to

count 8

teller Karen Lemus noticed Petitioner was wearing an Afro wig with white hair net and glasses. (Id. at 171.) She testified that when she saw Petitioner's picture in a photographic line up, her head began to hurt. (Id. at 178.) She stated that she was frightened at the time of the robbery. (Id. at 176.) In count 5, teller Julia Carrillo testified that Petitioner wore a dreadlock wig. (Id. at 213.) He demanded her large bills and she gave them to him. (Id. at 218.) Carrillo hit the alarm before he said don't press any buttons. (Id.) In count 12, teller Gabriel Arias recognized Petitioner from when his co-worker was robbed on December 31, 2001. (Id. at 266-67.) He testified that he was fearful. (Id. at 272.)

      These facts demonstrate that Petitioner's actions in all these counts engendered both actual and reasonable fear in the employees. Petitioner was dressed in a partial disguise, entered a bank and demanded money from a teller. The tellers described a response which demonstrated that he or she had no choice but to comply with Petitioner's demands. They had no way of knowing what Petitioner might do if they failed to comply. Their compliance showed they viewed Petitioner's demand as carrying an implicit threat that harm might result if they did not hand over the money. Even teller Donald Kirchmeier, who stated he was not intimidated, unwillingly handed the money over to Petitioner because he was trained to comply by his bank because of the potential threat to the safety of customers and employees. Kirchmeier complied because he knew there was a threat to safety.   In addition, the court of appeal found Petitioner's "failure to use a weapon or physical force; his failure to issue overt threats or to yell; his failure to impose consequences for noncompliance with his demands; and the failure of some tellers to testify they were afraid . . . . [were neither necessary to show fear nor did their absence] undermine the strong showing of actual and reasonable fear arising from the implicit threat of harm contained in Petitioner's demands for money and the tellers' compliance with his demands." (Lodgment at 12-13.)   Many of the tellers pushed the silent alarm further demonstrating that they were in a position requiring assistance from security or police. There was sufficient evidence showing that the victims were afraid and that their fear was reasonable

      Based on the evidence and overall instructions given to the jury, the Court concludes that the

failure to provide an explanation as to the definition of fear did not render the trial "so fundamentally unfair as to violate federal due process." See Duckett, 67 F.3d at 746. Accordingly, even if there was instructional error stemming from the trial court's failure to provide instructions regarding actual and reasonable fear, as described above, the court of appeal's harmless error ruling was not contrary to or an unreasonable application of Supreme Court precedent. See Inthavong, 420 F.3d at 1059. Accordingly, the state court's decision was not "contrary to, or involved an unreasonable application of, clearly established Federal law." See 28 U.S.C.A. § 2254(d)(1). Therefore, the Court recommends the Petition be DENIED on this ground for relief.

### B.     Ineffective Assistance of Counsel

Petitioner argues his Sixth Amendment right to effective assistance of counsel was violated when his counsel failed to request clarifying jury instructions on actual and reasonable fear. (Petition at 17.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"); Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997). A habeas petitioner must satisfy two requirements to demonstrate his assistance of counsel was so defective that habeas relief is warranted. First, the petitioner must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, the petitioner must show counsel's deficient performance prejudiced the defense. Id. The test for prejudice requires that the defendant show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. Id. at 694. In other words, petitioner must demonstrate his counsel's error rendered the result unreliable or the trial fundamentally unfair. Fretwell v. Lockhart, 506 U.S. 364, 372 (1993); Strickland, 466 U.S. at 694. Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment." United States v. Ferreira-Alameda, 815 F.2d 1251, 1253 (9th

1  Cir. 1987*)*; see Strickland, 466 U.S. at 690.  Petitioner must prove both elements.  The court may
2  reject his claim upon finding either that counsel's performance was reasonable or that the claimed
3  error was not prejudicial.  Strickland, 466 U.S. at 700.

4  In the instant case, Petitioner presented this issue only before the California Supreme Court.
5  The California Supreme Court denied Petitioner's application for relief in an order containing no
6  reasoning for its decision.  (Lodgment 3.)   Therefore, the Court must conduct an independent review
7  of the record to assess whether the state court erred in its application of controlling federal law.  See
8  Delgado, 223 F.3d at 982.

9  Here, Petitioner failed to demonstrate that his attorney's performance was deficient.  As
10 previously discussed, there was overwhelming evidence showing Petitioner's actions engendered
11 both actual and reasonable fear in the employees.  Many of the tellers testified they were fearful.
12 The teller's compliance by handing over the money showed that they felt threatened by Petitioner.
13 The tellers had no way of knowing what Petitioner might do if they failed to comply.  Moreover, the
14 record does not indicate, and the state appellate court did not find, any of the victims suffered from
15 irrational fears stemming from phobias or social anxiety disorders.  Thus, it was reasonable for
16 Petitioner's attorney not to ask for clarifying instructions on actual and reasonable fear.  Petitioner's
17 attorney's failure to ask the trial court to instruct the jury on subjective and objective fear did not
18 constitute performance that fell below the objective standard of reasonableness.  Accordingly, the
19 Court concludes that the state court did not err in applying controlling federal law and recommends
20 that habeas relief be DENIED as to this claim.  See Delgado, 223 F.3d at 982.

21 **C.     Failure to Instruct on Lesser Included Offense**

22 In the instant case, Petitioner argues the trial court violated his Fifth, Sixth, and Fourteenth
23 Amendment rights by failing to instruct the jury on the lesser-included offense of grand theft.
24 (Petition at 21.)

25 There is no clearly established Supreme Court law that requires giving a lesser-included
26 offense instruction in a non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (no
27 constitutional right to instruction on lesser-included offenses in non-capital cases); Bashor v. Risley,
28 730 F.2d 1228, 1240 (9th Cir.) cert. denied, 469 U.S. 838 (1984).  However, in Bashor, the Court

noted that there may be an exception where a criminal defendant is entitled to adequate instructions on his or her case. Bashor, 730 F.2d at 1240. Because the California Supreme Court denied Petitioner's petition without citation, this Court will "look through" the summary denial to the last reasoned state court decision on the issue. Nunnebaker, 501 U.S. at 801. The last reasoned decision on this issue was in the state appellate court. (Lodgment 2.)

When the property is taken from the victim without force or fear, the crime is grand theft, whereas robbery is a form of theft, with the additional element of the application of force or fear while taking the property from the victim. See Cal. Penal Code §§ 484, 487; People v. Ramkeesoon, 39 Cal. 3d 346, 351 (1985).

In the instant case, the state appellate court confirmed the trial court's finding that there was no substantial evidence that any of the offenses were committed without the use of fear. (Lodgment 2 at 13-14.) As previously discussed, the court found overwhelming evidence in the record that in committing the crimes, Petitioner provoked both actual and reasonable fear in the employees. Petitioner was dressed in a partial disguise, entered a bank and demanded money from a teller. The tellers described a response which demonstrated that he or she had no choice but to comply with Petitioner's demands. They had no way of knowing what Petitioner might do if they failed to comply. Their compliance showed they viewed Petitioner's demand as carrying an implicit threat that harm might result if they did not hand over money. Instructions on the lesser included offense of grand theft would not have permitted the jury to find Petitioner guilty of grand theft and acquit him of robbery. Accordingly, the Court recommends the Petition be DENIED based on this ground for relief.

**D.     Sufficiency of the Evidence**

Petitioner argues that there was insufficient evidence to support a finding that the bank tellers suffered both actual and reasonable fear.

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient

proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." <u>Jackson v. Virginia</u>, 443 U.S. 307, 316 (1979). In <u>Jackson</u>, the Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319. A petitioner challenging the sufficiency of the evidence used to obtain a state conviction bears a heavy burden. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). When reviewing the sufficiency of the evidence supporting a conviction, the issue "is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991). The Ninth Circuit held that after AEPDA, courts must apply the sufficiency of evidence standard with an additional standard of deference. <u>Juan H.</u>, 408 F.3d at 1274-75. The court asks whether the decision of the California Court of Appeal is an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Id.</u> at 1275 & n. 13.

Because the California Supreme Court denied Petitioner's petition without citation, this Court will "look through" the summary denial to the last reasoned state court decision on the issue. <u>Nunnemaker</u>, 501 U.S. at 801. The last reasoned decision on this issue was in the state appellate court. (Lodgment 2.)

The court of appeal held that there was substantial evidence of fear that a reasonable trier of fact could find guilt beyond a reasonable doubt. (<u>Id.</u> at 14-15.) This Court has engaged in a thorough review of the complete state court record to determine whether the state court unreasonably applied <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Id.</u> The facts in this case reveal that the victims suffered from actual and reasonable fear when they were robbed by Petitioner. Petitioner was dressed in a partial disguise and demanded money from all the tellers. The tellers described a response which demonstrated that he or she had no choice but to comply with Petitioner's demands. There was always the implicit threat that harm might result either to them or to their customers if they did not hand over the money. Many of the tellers pushed the silent alarm further demonstrating that they were in a position requiring assistance from security or police. Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence showing that the victims were

afraid and that their fear was reasonable. The Court concludes that the decision of the court of appeal was not an objectively unreasonable application of Jackson and Winship to the facts of this case. See Juan H, 408 F.3d at 1275. Therefore, the Court recommends the Petition be DENIED on this ground for relief.

**VI.      CONCLUSION**

After thorough review of the record in this matter and based on the foregoing analysis, this Court recommends that the Petition for Writ of Habeas Corpus be DENIED and this action be DISMISSED WITH PREJUDICE. This Proposed Findings of Fact and Recommendation for Disposition of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, the Honorable Jeffrey T. Miller, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (2007) and Local Rule 72.1(d).

IT IS HEREBY ORDERED that **no later than October 19, 2007**, any party may file and serve written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed and served no later than ten days after being served with the objections. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. Martinez v. Y1st, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: September 21, 2007

_____
LOUISA S PORTER
United States Magistrate Judge